# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

UPS GROUND FREIGHT, INC.,

                              Plaintiff,            :        Case No. 3:12-cv-130

      -  vs  -                             Magistrate Judge Michael R. Merz

JAMES FARRAN,

                              Defendant.         :

---

# DECISION AND ORDER

---

This case is before the Court on Motion of Plaintiff UPS Ground Freight, Inc. ("UPS") for Summary Judgment on the counterclaim of Defendant Transguard Insurance Company of America, Inc. ("Transguard")(Doc. No. 40).  In addition to a Response in Opposition (Doc. No. 45), Transguard has filed a what amounts to a cross-motion for summary Judgment on its counterclaim (Doc. No. 52).  The parties have also filed a Joint Stipulation of Facts (Doc. No. 39).

The parties unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) in their Report under Fed. R. Civ. P. 26(f)(Doc. No. 24,  PageID 74, ¶ 3) and the case was referred to the undersigned on that basis by District Judge Walter Herbert Rice (Doc. No. 27).

The subject matter jurisdiction of the Court is grounded in the diverse citizenship of the parties and the amount in controversy which exceeds $75,000 exclusive of interest and costs (Complaint, Doc. No. 1, PageID 1, ¶ 5.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;  the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original).  Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as

a matter of law.  Fed. R. Civ. P. 50).  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.  *Id*. The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996).  "On summary judgment," moreover, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323;  *see also, Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted).  If the moving party meets this burden, the nonmoving party must go beyond

the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n*., 968 F.2d 606 (6ᵗʰ Cir. 1992).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6ᵗʰ Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## STIPULATED FACTS

The following facts are stipulated to by the parties:

1. On December 22, 2008, Ronald Sprinkle sustained an injury to his hand while attempting a "jumping" or starting of Farran's commercial road tractor (hereinafter "Incident"). The Incident took place at Howard Truck Repair in Tipp City, Miami County, Ohio.

2. On July 13, 2010 Ronald Sprinkle initiated a lawsuit against Farran and UPS in the Miami County Court of Common Pleas, Ohio, Case No. 10-CV-00627 (the "Miami County Lawsuit").

3. At the time of the Incident, Farran was insured under a policy of insurance issued to National Association of Independent Truckers LLC (NAIT) of which Farran was a member and a certificate holder, which is attached hereto [to Doc. No. 39] as Exhibit 1. Transguard provided a defense of Mr. Farran in the Miami County Lawsuit pursuant to the policy.

4. In the Miami County Lawsuit, Ronald Sprinkle alleged that he sustained injuries and damages as a result of the negligence of James Farran and UPS Ground Freight, including, but not limited to severe and permanent injury in the form of the partial loss of

4

three fingers, past medical expenses in excess of $40,535.17, undetermined future medical expenses, and an undetermined loss of future income.

5. Farran and UPS denied all liability with regard to the Incident in the Miami County Lawsuit.

6. On March 17, 2011, during the pendency of the Miami County Lawsuit, UPS moved for summary judgment and sought a dismissal of all claims brought against it by Ronald Sprinkle. UPS claimed that no vicarious or other liabilities existed on the part of UPS with regard to the Incident.

7. On March 31, 2011, in connection with the Miami County Lawsuit, Farran testified in a discovery deposition. A copy of Farran's discovery deposition is attached [to Doc. No. 39] as Exhibit 2.

8. Prior to the Incident, on May 4, 2007 Farran and UPS entered into a "UPS Freight Independent Contractor Operating Agreement." (hereinafter "Operating Agreement"). A copy of the Operating Agreement is attached hereto [to Doc. No. 39] as Exhibit 3. All references to "Equipment" in the Operating Agreement refer to the commercial road tractor referred to in Paragraph 1 of the Joint Stipulations Of Fact.

9. On June 20, 2011, UPS's Motion for Summary Judgment was denied by the Miami County Court of Common Pleas on the basis of the controlling law established by the Ohio Supreme Court decision of *Wyckoff Trucking, Inc. v. Marsh Bros. Trucking, Inc.* 58 Ohio St.3d 261 (1991). A copy of the Miami County Court of Common Pleas' decision, denying UPS's Motion for Summary Judgment, is attached [to Doc. No. 39] as Exhibit 4.

10. At no point in time during the pendency of the Miami County Lawsuit was Farran or UPS ever adjudged to be negligent in any manner with regard to the Incident.

11. During a September 30, 2011, mediation, a fair and reasonable settlement was reached with regard to the disputed claims arising out of the Incident. The total amount accepted by Ronald Sprinkle in exchange for dismissal of all claims against Farran and UPS was $160,000. As a part of that agreement, UPS agreed to pay and paid $80,000 to Ronald Sprinkle. Transguard, on behalf of Farran, agreed to pay and did pay $80,000 to Ronald Sprinkle.

12. Pursuant to that settlement, Ronald Sprinkle, UPS, Farran and Transguard entered into a Confidential Settlement Agreement and Release ("Settlement Agreement"). An executed copy of the Settlement Agreement is attached [to Doc. No. 39] as Exhibit 5.

13. Pursuant to the Settlement Agreement, all signing parties, including UPS, Farran, and Transguard, understood and agreed that the settlement was a compromise of a doubtful and disputed claim (Settlement Agreement at ¶ 6) and that by entering into the Settlement Agreement, none of the Released Parties, namely UPS, Farran, and Transguard was admitting liability with respect to the Incident. (Settlement Agreement at ¶ 6). It was further agreed by all signing parties, including UPS, Farran, and Transguard, that nothing contained in the Settlement Agreement and no act on the part of the Released Parties "shall be construed to be an admission or confession on the part of the Released Parties of any liability" with regard to the Incident. (Settlement Agreement at ¶ 6).

14. Within the Settlement Agreement, UPS, Farran, and Transguard reserved all rights against each other related to coverage, reimbursement, indemnity and contribution.

15. UPS, Farran, and Transguard have never admitted to negligence nor been held or adjudged to be negligent in any manner with regard to the Incident.

(Joint Stipulation of Facts, Doc. No. 39, PageID 128-31)(herineafter "Joint Stip. ¶ ___")

## Positions of the Parties

### UPS's Position

In its Motion, UPS contends the sole basis of Transguard's counterclaim is the doctrine of statutory employment under Ohio law (Doc. No. 40, PageID 437).[1]  UPS further contends that it is undisputed that Farran, Transguard's insured, was at the time of the Incident an independent

---

[1] Transguard asserts, to the contrary, that the statutory employment doctrine is "only one avenue by which Transguard is entitled to indemnification."  (Doc. No. 45, PageID 687, n. 7.)

contractor of UPS who was off-duty and on his own personal time. *Id.* Given those facts, UPS

asserts there is no basis for Transguard to recover under Ohio law, either in tort or contract. *Id.*

The relationship between Farran and UPS is governed by a UPS Freight Independent

Contractor Operating Agreement ("Operating Agreement") entered into May 4, 2007 (Joint Stip.

¶ 8). The Operating Agreement is attached to the Joint Stipulation at PageID 338-59. As

paraphrased in UPS's Motion, the Operating Agreement provides as follows with respect to

repair and maintenance:

> 6(A) Maintenance and Inspection. [Farran] shall equip and
> maintain the [Truck] in accordance with all applicable government
> regulations including but not limited to ensuring its systematic
> repair and maintenance and keeping it in compliance with the laws
> and regulations of federal, state, local, or foreign authorities, and
> [UPS Ground Freight's] safety and equipment maintenance
> policies. * * *
>
> 7. [FARRAN'S] RESPONSIBILITIES. * * * It shall be the sole
> responsibility of [Farran] to determine the manner and means of
> performing all of [Farran's] services under this Agreement,
> including, but not limited to: * * *
>
> > 7(B) Selecting, purchasing, and financing the [Truck] and
> > **deciding when, where, and how maintenance and
> > repairs are to be performed on the [Truck].**
>
> 8(A) Operating Expenses. [Farran] shall, at [Farran's] expense,
> provide the [Truck] to [UPS Ground Freight] ready to operate and
> fully roadworthy, and shall furnish all lubricants, fuel, tires
> (including changing or repairing tires), parts, supplies, equipment,
> and repairs (including repairs to the [Truck's] blower) necessary
> for the safe and efficient operation and maintenance of the [Truck].
> [Farran] shall pay all expenses incident to the operation of the
> [Truck], including, but not limited to * * * maintenance and repair
> costs * * *

(Motion, Doc. No. 40, PageID 440, emphasis *sic*.)

7

On deposition in the Miami County Lawsuit, Mr. Farran testified his conduct during the time surrounding the Incident was consistent with the Operating Agreement (Farran Depo. Doc. No. 39-2, PageID 209-337). Needing to provide maintenance on the Truck, he requested time off from UPS dispatch for "a couple of days" which was agreed to by the relevant dispatch personnel. *Id.* at PageID 248-250. He then dropped off a UPS trailer in Columbus, Ohio. *Id.* PageID 229. At that point he understood he was no longer working for UPS. *Id.* He then drove the Truck to a repair shop in Tipp City, Ohio, to have it repaired. *Id.* He understood that the time he spent taking the Truck for repairs was, in the usage of the trucking industry, "personal use" time and he recorded the time on December 21, 2008, after dropping off the trailer and the time for December 22, 2008, the date of the Incident, as "personal use" time in his hours-of-service log. *Id.* at PageID 224-226. On December 22, 2008, upon arriving at the repair shop, he discovered that the Truck would not start. Mr. Sprinkle, a stranger, offered to help and was injured in the attempt. *Id.* at PageID 227-229.

In the Miami County Lawsuit, Sprinkle sued Farran and UPS asserting vicarious liability and liability under the statutory employment doctrine (Joint Stip. ¶ 2). Transguard provided a defense to Farran in that case. *Id.* at ¶ 3. UPS moved for summary judgment. *Id.* at ¶ 6. Judge Lindeman denied the motion (Decision, Doc. No. 39-4, PageID 422-26). He held

> If this case was [sic] to be decided on a common law basis, the Court would find from the evidentiary material submitted that Farran was not acting within the scope of his employment (or contract) at that [sic] time Sprinkle was injured, and grant the Defendant's motion for summary judgment.
>
> But, this Court is bound by the *Wyckoff* case [*Wyckoff Trucking, Inc., v. Marsh Bros. Trucking, Inc.,* 58 Ohio St. 3d 261 (1991)] and the Second Appellate District cases applying and interpreting the public policy reason to establish an irrebuttable presumption; which is to protect injured third parties in such cases from the

>        factual confusion attendant to determining who is responsible for
>        damages. *Cincinnati Ins. Co. v. Haack*, pg. 197, [*Cincinnati Ins.
>        Co. v. Haack*, 125 Ohio App. 3d 183 (2nd Dist. 1997)]citing
>        *Wyckoff*.
>
>        The Defendant's motion for summary judgment is overruled.

*Id.* at PageID 425-26. In the wake of this Decision, the Miami County Lawsuit was mediated, resulting in a settlement with payments of $80,000 each to Sprinkle from UPS and from Transguard on behalf of Farran (Joint Stip. ¶ 11). UPS brought the present suit seeking indemnity, contribution, and a declaration that Farran and Transguard must reimburse UPS for the $80,000 UPS paid Sprinkle. Transguard's counterclaim[2] seeks to recover from UPS the $80,000 it paid to Sprinkle in settlement of the Miami County Lawsuit.

UPS asserts "the doctrine of statutory employment is no longer controlling law in Ohio in light of a subsequent amendment of the regulation upon which the *Wyckoff* decision was expressly based." (Motion, Doc. No. 40, PageID 446.) Even if statutory employment were still the law, UPS further asserts "the doctrine does not apply to claims of indemnification and contribution, the precise claims asserted by Transguard in this matter." *Id.*

**Transguard's Position**

Transguard argues the real issue in the case is whether UPS, because it is self-insured, was required to provide Farran a defense in the Miami County lawsuit (Doc. No. 45, PageID 682). More importantly, it asserts *Wyckoff* is still the law of Ohio despite amendments to 49 C.F.R. ¶ 376.12(c)(4). *Id.* Transguard claims that "the only way UPS would not be required to

---

[2] The counterclaim was denominated a "cross-claim" when filed. (Answer, Doc. No. 15, PageID 46.)

9

indemnify Transguard is if it can establish that it is entitled to contribution under" Ohio Revised Code § 2307.34 (Response, Doc. No. 45, PageID 682).

Transguard notes the following facts not mentioned in the statement above of UPS's position. Paragraph 1 of the Operating Agreement acknowledges that UPS is a for-hire interstate motor carrier registered under U.S. Department of Transportation ("DOT") No. 121058 with the Federal Motor Carrier Safety Administration and therefore subject to the leasing regulations contained in 49 C.F.R. § 376. Based on those regulations, UPS required Farran to display its Interstate Commerce Commission placards and DOT number on the Truck at all times. The Operating Agreement provides that UPS assumed complete responsibility for the operation of the Truck and Farran transported goods exclusively for UPS.

Farran expected to be immediately available to haul another trailer for UPS as soon as his Truck was repaired (Farran Depo.,Doc. No. 39-2, PageID 251-252). Despite the Incident and once the repairs were completed, Farran was dispatched to the UPS terminal in Columbus, Ohio, to pick up a trailer for delivery to South Holland, Illinois. *Id.*

# Analysis

**The Statutory Employment Doctrine**

In *Wyckoff Trucking, Inc., v. Marsh Bros. Trucking Service, Inc.,* 58 Ohio St. 3d 261 (1991), the Ohio Supreme Court adopted the doctrine of statutory employment for cases of the type before this Court. It decided

> 1. In tort causes of action involving leased vehicles of interstate motor carriers, primary liability shall be determined with regard to Interstate Commerce Commission regulations rather than the

common-law doctrines of *respondeat superior*, master-servant, independent contractor and the like. (*Thornberry* v. *Oyler Bros., Inc.* [1955], 164 Ohio St. 395, 58 O.O. 189, 131 N.E. 2d 383, overruled to the extent inconsistent herewith.)

2. In order for liability to attach on an interstate carrier-lessee under Interstate Commerce Commission regulations, it must be established that, at the time the cause of action arose, (1) a lease of the vehicle was in effect and (2) the vehicle displayed the carrier-lessee's placard listing its I.C.C. numbers. (Section 1057.12, Title 49, C.F.R., applied.)

3. Section 1057.12(c)(1), Title 49, C.F.R. creates an irrebuttable presumption of an employment relationship between the carrier-lessee and the driver of a vehicle that displays the I.C.C. identification numbers of the carrier-lessee.

*Id.* at 263 (syllabus).  The court further opined:

The determinative issue in this appeal is whether a carrier-lessee of a motor vehicle engaged in interstate commerce is liable under Interstate Commerce Commission ("I.C.C.") regulations for any accidents caused by the negligence of the driver while the lease is in effect and while the motor vehicle displays the carrier-lessee's I.C.C. placards or identification numbers, even though the driver is not the lessee's employee. For the reasons that follow, we answer such inquiry in the affirmative, and thereby reverse the judgment rendered by the court of appeals below.

The court of appeals below relied on this court's prior pronouncement in *Thornberry* v. *Oyler Bros., Inc.* (1955), 164 Ohio St. 395, 58 O.O. 189, 131 N.E. 2d 383, in finding, *inter alia*, that traditional common-law doctrines, such as *respondeat superior*, are to be used in determining liability in interstate carrier accident cases involving leased vehicles. However, *Thornberry* was decided prior to the amendments to the Interstate Commerce Act (former Section 304, Title 49, U.S. Code, Ch. 928, Pub. Law 957, 70 Stat. 983, 1 U.S. Code Cong. & Adm. News [1956] 1163), which, as amended, are now codified at Section 11107, Title 49, U.S. Code. At the time *Thornberry* was handed down, the I.C.C. rules provided that the carrier-lessee had merely the right to direct

and control the operation of the leased motor vehicle. Former Administrative Rule No. 4, quoted in *Behner* v. *Indus. Comm.* (1951), 154 Ohio St. 433, 438-439, 43 O.O. 360, 363, 96 N.E. 2d 403, 406. However, the new I.C.C. rule provides that the lessee *shall have exclusive possession and control of the vehicle and shall assume complete responsibility* for the operation of the vehicle. Section 1057.12(c)(1), Title 49, C.F.R. Section 1057.12, Title 49, C.F.R. is as follows:

> Except as provided in the exemptions set forth in Subpart C of this part, the written lease required under § 1057.11(a) shall contain the following provisions. The required lease provisions shall be adhered to and performed by the authorized carrier.
>
> "* * *
>
> "(c) Exclusive possession and responsibilities -- (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

*Id.* at 264. The court noted that there were two views on the determination of tort liability arising out of accidents involving leased vehicles of interstate motor carriers. One line of cases, the minority view, read the I.C.C. regulations as creating only a rebuttable presumption of an employment relationship between the driver and the carrier-lessee.

> On the other hand, the majority view holds that Section 1057.12(c)(1), Title 49, C.F.R. creates an irrebuttable presumption of an employment relationship between the carrier-lessee and the driver of the vehicle that displays the I.C.C. placards of the carrier-lessee. This irrebuttable presumption is also referred to as the doctrine of statutory employment. The majority viewpoint strictly construes the I.C.C. regulations and essentially states that if the driver is negligent, the carrier-lessee is liable as a matter of law for accidents that occur while a lease is still in effect and its I.C.C.

12

placards are displayed on the vehicle. See, *e.g., Rodriguez* v. *Ager* (C.A.10, 1983), 705 F. 2d 1229; *Wellman* v. *Liberty Mut. Ins. Co.* (C.A.8, 1974), 496 F. 2d 131; *Simmons* v. *King* (C.A.5, 1973), 478 F. 2d 857; *Proctor* v. *Colonial Refrigerated Transp., Inc.* (C.A.4, 1974), 494 F. 2d 89; *Mellon Natl. Bank & Trust Co.* v. *Sophie Lines, Inc.* (C.A.3, 1961), 289 F. 2d 473.

*Id.* at 265. In *Wyckoff* the court abandoned its attachment to the minority view and adopted what it termed the majority position. *Id.* at 266.

Shortly after *Wyckoff* was decided, the Interstate Commerce Commission amended the underlying regulation, now re-numbered as 49 C.F.R. § 376.12(c), to provide:

> (4) Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

The ICC[3] adopted this new provision "because certain State courts and administrative tribunals have determined that the regulations affect the relationship between the lessee and the lessor." 57 Fed. Reg. 32905-01 (July 23, 1992). UPS cites a number of ICC sources for the proposition that the ICC had not intended, even before this amendment, to affect the employment status of independent owner-operator lessors. (Motion, Doc. No. 40, PageID 449, citing 57 Fed. Reg. 32905-01.) UPS also cites numerous cases decided since 1992 in which various courts have held that the ICC's intent in making the amendment is effective and 49 C.F.R. § 376.12 does not affect the employment status of the leasing owner-operator. *Id.*, cases cited in n. 5.

Furthermore, UPS cites numerous cases from outside of Ohio recognizing that the 1992 amendments abrogate the doctrine of statutory employment. *Id.* at PageID 450. For example, in

---

[3] The ICC was abolished in 1995. The relevant regulations are now maintained by the Federal Motor Carrier Safety Commission. *Bays v. Summit Trucking, LLC*, 691 F. Supp. 2d 725, 728, n.1 (W.D. Ky. 2010).

*Bays v. Summit Trucking, LLC*, 691 F. Supp. 2d 725 (W.D. Ky. 2010), Judge Jennifer Coffman

held

> The majority of federal circuit courts that Bays cites for the proposition that lessee-carriers are strictly liable for owner-operators' negligence while operating leased vehicles did so prior to the 1992 amendments to the regulations. *Price v. Westmoreland,* 727 F.2d 494, 495 (5th Cir. 1984); *Rodriguez v. Ager,* 705 F.2d 1229, 1237 (10th Cir. 1983); *Wellman v. Liberty Mut. Ins. Co.,* 496 F.2d 131, 136 (8th Cir. 1974); *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F.2d 473, 478 (3d Cir. 1961). Those cases were "based upon an interpretation of the ICC regulations that were unintended by the ICC." *Penn v. Va. Int'l Terminals, Inc.,* 819 F. Supp. 514, 523 (E.D. Va. 1993). Specifically, in 1992, section (c)(4) was added, which is directly applicable to the issue before this court. It renders older cases "a misrepresentation of the regulation, especially with the hindsight provided by the 1992 amendment . . . ." *Id.* at 522-23.
>
> Notably, the ICC expressed support for this court's interpretation of the neutral effect of section (c)(1) on carrier liability. Administrative agencies, like the ICC, are entitled to deference when interpreting their own regulations. *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S. Ct. 1215, 89 L. Ed. 1700 (1945). Commentaries issued by the ICC prior to the 1992 amendments demonstrate the ICC's intention that courts apply traditional law of agency in resolving questions of liability such as the present one. "The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist." *Ex Parte No. MC-43 (SUB-NO 16),* Lease and Interchange of Vehicles (Identification Devices), 3 I.C.C. 2d 92, 93 (1986).
>
> Then, in 1992, when the ICC added section (c)(4) to the regulation, the ICC reaffirmed that it did not intend section (c)(1) to have sweeping effects on the obligations of the carrier-lessee. In fact, the ICC asserted the neutrality of the regulation on the independence of lessors and stated "that the regulation does not affect 'employment' status." *Pet. to Amend Lease and Interchange*

14

> *of Vehicle Regulations,* 8 I.C.C. 2d 669, 671 (1992). The addition
> of section (c)(4) was meant to "give notice to the courts . . . that
> [(c)(1)] . . . is not intended to affect the relationship between a
> motor carrier lessee and the independent owner-operator lessor."
> *Id.* at 670.

*Id.* at 730-31.

Transguard responds that the law has not changed **in Ohio** since the 1992 regulatory

amendments (Response, Doc. No. 45, PageID 690), *citing Cincinnati Ins. Co. v. Stacey,* Case

No. CA2008-06-019, 2008 Ohio 6761, 2008 Ohio App. LEXIS 5630 (12th Dist. 2008); *Ohio*

*Cas. Ins. Co. v. United Southern Assur. Co.,* 85 Ohio App. 3d 529 (2nd Dist. 1993); *Canal Ins.*

*Co. v. Brogan,* 93 Ohio App. 3d 765 (10th Dist. 1994); *Cincinnati Ins. Co. v. Haack,* 125 Ohio

App. 3d 183 (2nd Dist. 1997).

In *Stacey*, the most recent of these cases, the court of appeals noted the change in the

federal regulation but opined

> However, Ohio courts continue to follow the *Wycoff* [sic]
> presumption, such as the Second District did in *Haack.*  See, also*,*
> *Canal Insurance Co. v. Brogan* (1994), 93 Ohio App. 3d 765, 639
> N.E. 2d 1219.   Additionally, other jurisdictions following the
> majority view adhere to the presumption of statutory employment
> following this amendment.  See *Williamson v. Steco Sales, Inc.*
> (1995), 191 Wis. 2d 608, 530 N.W. 2d 412.

2008 Ohio App. LEXIS 5630 at ¶ 24.

In *Haack*, the Second District Court of Appeals analyzed the history of motor carrier

liability in cases such as this including the involvement of the ICC as far back as its adoption of

Administrative Rule No. 4 in 1936 up through the adoption of 49 C.F.R. 1507.12 and its

application by the Supreme Court of Ohio in *Wyckoff*.  125 Ohio App. 3d at 189-98.  However,

although *Haack* was handed down in 1997 (and is reported as "corrected" July 19, 1999, without

indication of what corrections were made), it does not discuss the 1992 amendment to the regulation or even cite to the regulation by its recodified number, 49 C.F.R. § 376.12. In distinguishing between the "majority of jurisdictions [which] hold that Sections 1057.12 and 1043.1 create an irrebuttable presumption" and the "minority of jurisdictions [which] hold that a written lease in combination with the display of the lessee's I.C.C. placard creates only a rebuttable presumption of the lessee's liability," Judge Young cites only cases decided before the 1992 amendments. *Haack*, 125 Ohio App. 3d at 196. Ultimately, the Second District followed its own post-*Wyckoff* precedent, *Ohio Casualty Ins. Co. v. United Southern Assurance Co.*, 85 Ohio App. 3d 529 (1993)(Wolff, J.) In *Ohio Casualty*, Judge Wolff wrote that the Ohio Supreme Court had "created" an irrebuttable presumption in *Wyckoff*; the 1992 amendment to 49 C.F.R. § 376.12 is not mentioned.

In *Brogan*, the Tenth District Court of Appeals in 1994 treated *Wyckoff* as the governing law and agreed with Judge Wolff's opinion in *Ohio Casualty* extending *Wyckoff* to resolving disputes among involved insurance carriers as well as with accident victims. It also includes no discussion of the 1992 amendments.

Transguard acknowledges two Sixth Circuit decisions cited by UPS which cut the other way, *Carolina Cas. Ins. Co. v. Panther II Transp., Inc.,* 402 F. App'x. 62 (6th Cir. 2010), and *Gilstorff v. Top Line Exp., Inc.,* 106 F.3d 400 (6th Cir. 1997)(unpublished)(table)(Response, Doc. No. 45, PageID 693). In *Carolina Casualty*, the Sixth Circuit opined that the Ohio Supreme Court would not extend *Wyckoff* to disputes between insurance companies and followed its own prior unpublished decision in *Gilstorff*, noting that the policy rationale of *Wyckoff* – protection of injured third parties from the complexity of inter-insurer litigation -- did not reach disputes between insurers. *Id.* at * 66.

Transguard then argues that, by declining review in *Canal* and *Stacey*, the Ohio Supreme Court "effectively affirmed" those decisions (Response, Doc. No.45, PageID 693). However, no such effect is to be inferred from denial of review. Ohio Sup. Ct. Rep. R. 4.1 provides "[t]he refusal of the Supreme Court to accept any case for review shall not be considered a statement of opinion as to the merits of the law stated by the trial or appellate court from which review is sought." Although this rule is quoted in its amended version effective July 1, 2012, it continues prior Ohio Supreme Court law. See *Williamson v. Rubich*, 171 Ohio St. 253 (1960), and Ohio Rep. R. 8(B)(effective May 1, 2002).

Despite *Carolina Casualty* and *Gilstorff*, *supra,* Transguard asserts *Wyckoff* is controlling because "*Erie*, 304 U.S. 64, require[es] that state law apply in diversity actions." (Response, Doc. No. 45, PageID 693.)


**Federal Law, Not Ohio Law, Governs this Case**


In *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the Supreme Court overruled *Swift v. Tyson*, 41 U.S. 1 (1841) in which Justice Story had written for the Court that "the laws of the several states" in the Judiciary Act of 1789 means only the statutory law of the States. The relevant provision of the 1789 Act remains part of federal law, is now codified at 28 U.S.C. § 1652[4], and provides "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." After *Erie*, this statute means that the case law of Ohio as well as its statutes, constitute the law of Ohio and the federal courts must accept the state court determinations of what the state law is.

---

[4] Title 28 of the United States Code was enacted as positive law June 25, 1948, at 62 Stat. 944.

The bench and bar sometimes treat the holding in *Erie* as shorthand for the proposition that Ohio case law governs in diversity cases, but that is a misreading of *Erie*. It is on the one hand underinclusive: Ohio case law governs federal courts' adjudication under 28 U.S.C. § 1367 of common law claims pendent to claims within the original federal question jurisdiction of the district courts under 28 U.S.C. § 1331 (e.g., a common law assault claim appended to a Fourth Amendment excessive force claim in a case under 42 U.S.C. § 1983). It is also overinclusive. When a question of federal law arises in a diversity case, the federal court must decide that question as it would any question of federal law. It is not bound by the decisions of the forum state courts on questions of federal law.

*Wyckoff* is plainly an opinion of the Supreme Court of Ohio on a question of federal law, to wit, what is the proper interpretation and application of a federal regulation, 49 C.F.R. § 1507.12(c)(1). In *Wyckoff* the Ohio Supreme Court expressly says that it is interpreting that regulation, rather than common law doctrines, as governing leased vehicles of interstate motor carriers. *Wyckoff, supra*, ¶ 1 of the syllabus. It expressly says "§ 1507.12(c)(1), Title 49, C.F.R. creates an irrebuttable presumption . . ." *Id.* at ¶ 2 of the syllabus. *Erie* does not give state court decisions precedential effect in deciding questions of federal law. Therefore *Wyckoff* does not control here.[5]

This is not to suggest it was inappropriate for the Ohio Supreme Court to decide this question of federal law when it arose in the course of the Wyckoff tort litigation. State courts regularly decide questions of federal law (e.g., did a given traffic stop violate the Fourth Amendment) in the course of their work deciding cases. It is just that there decisions on federal

---

[5] The Ohio courts are of course free to adopt the statutory employment doctrine as a matter of Ohio law for motor carriers operating only in intrastate commerce and therefore holding certificates issued by the Public Utilities Commission of Ohio. Technically, the *Haack* case interprets a PUCO regulation which parallels 49 C.F.R. § 376.12.

law questions do not have the binding effect in subsequent federal cases that *Erie* gives to their decisions of state law questions.

This Court is free to decide the meaning of the ICC regulation without being bound by *Wyckoff*. The ICC 1992 amendment to 49 C.F.R. § 376.12 shows that the Ohio Supreme Court misinterpreted what the ICC intended by its regulation of the leases of vehicles by interstate motor carriers. The better interpretation in light of the purpose of those amendments is that given by Judge Coffman in *Bays, supra*, which this Court adopts. As Judge Coffman points out, a federal agency's interpretation of its own regulations is entitled to deference from the federal courts. Furthermore, while *Carolina Casualty* and *Gilstorff*, *supra,* are not controlling because they are not published opinions of the Sixth Circuit, they are consistent with this approach.

Given that state of the law, there are no genuine disputes among the parties as to any material fact and UPS is entitled to judgment as a matter of law, dismissing Transguard's counterclaim. The facts developed from Farran during his deposition dispose completely of any factual assertion upon which liability of UPS could be based. Farran had dropped his last load being hauled for UPS and had advised the UPS dispatcher that he would be "bobtailing" to get the truck repaired. He was still doing that when the Incident occurred. During periods of "bobtailing," Transguard had contracted to provide liability insurance and was responsible for providing Farran's defense in the Miami County Lawsuit.

This decision is not precluded by *res judicata*. Even though Judge Lindemann had determined that *Wyckoff* was binding on him when he denied UPS's motion for summary judgment, that decision did not become embodied in a final judgment because the parties settled the Miami County Lawsuit before it reached judgment on the merits. A final judgment on the merits is required. Under Ohio law:

> A valid, final judgment rendered upon the merits bars all
> subsequent actions based upon any claim arising out of the
> transaction or occurrence that was the subject matter of the
> previous action.

*Grava v. Parkman Twp*., 73 Ohio St. 3d 379 (1995), syllabus. (Paragraph two of the syllabus of *Norwood v. MacDonald,* 142 Ohio St. 299 (1943), overruled; paragraph two of the syllabus of *Whitehead v. Gen. Tel. Co*., 20 Ohio St. 2d 108 (1969), overruled to the extent inconsistent herewith; paragraph one of the syllabus of *Norwood, supra*, and paragraph one of the syllabus of *Whitehead, supra,* modified; 1 Restatement of the Law 2d, Judgments (1982), §§ 24-25, approved and adopted.)  Federal courts in subsequent litigation are obliged to give prior state court judgments the same effect those judgments would be given in the courts of the rendering State.  28 U.S.C. § 1738,  *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373 (1985);  *Migra v. Warren City School District Board of Edn.,* 465 U.S. 75 (1984);  *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461 (1982); *Trafalgar Corp. v. Miami County,* 519 F.3d 285 (6th Cir. 2008), *citing Hamilton's Bogarts, Inc. v. State of Michigan*, 501 F.3d 644, 650 (6th Cir. 2007); *Gutierrez v. Lynch*, 826 F.2d 1534 (6th  Cir. 1987);  *McNasby v. Crown Cork and Seal Co., Inc.,* 888 F.2d 270 (3rd  Cir. 1989).

UPS indicates its "contribution claim against Transguard is not the subject of the present Motion for Summary Judgment." (Reply, Doc. No. 46, PageID 728.)  Since UPS does not seek summary judgment on that question, it is not appropriate for the Court to decide that question at this point.  However, it does not appear that there are additional disputed facts on this issue other than perhaps the amount of fees and costs from the Miami County Lawsuit.

Counsel shall consult with one another and advise the Court, jointly if possible, of additional procedures needed to bring this case to finality.  UPS's Motion for Summary

Judgment (Doc. No. 40) is GRANTED: Transguard's Motion for Summary Judgment is DENIED.


January 7, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge